```
 1                IN THE UNITED STATES DISTRICT COURT

 2              FOR THE WESTERN DISTRICT OF OKLAHOMA

 3

 4    ANGELA STANLEY-COOLAHAN,
           Plaintiff,
 5
      vs.                                 No. CIV-20-1237-G
 6
      SAM'S CLUB EAST, INC. d/b/a
 7    SAM'S CLUB, et al.,
           Defendants.
 8

 9            VIDEOTAPED DEPOSITION OF STEVE WILKINS
                 TAKEN ON BEHALF OF THE PLAINTIFF
10         ON JUNE 9, 2021, BEGINNING AT 9:35 A.M.
                   IN OKLAHOMA CITY, OKLAHOMA
11

12                         APPEARANCES:

13    Appearing on behalf of the PLAINTIFF:

14    Chad W.P. Kelliher
      FULMER, SILL
15    1101 North Broadway, Suite 102
      Oklahoma City, Oklahoma 73103
16    (405) 510-0077
      ckelliher@fulmersill.com
17

18    Appearing on behalf of the DEFENDANT:

19
      Jeffrey D. Scott
20    HILTGEN & BREWER, P.C.
      9505 North Kelley Avenue
21    Oklahoma City, Oklahoma 73131
      (405) 605-9000
22    jscott@hiltgenbrewer.com

23

24    VIDEOTAPED BY:  Stesha Snow

25    REPORTED BY:  Lacy Antle, CSR, RPR
```

EXHIBIT 2

**Professional Reporters**
800.376.1006
www.proreporters.com

```
 1            Q     Do you know if any other Sam's Club

 2    employees observed you putting these tables up on

 3    their sides to work on them?

 4                  MR. SCOTT:  Object to the form.

 5                  You can answer.

 6                  THE WITNESS:  I'm not sure, there may have

 7    been some people in the cafe working at the cafe

 8    that saw me do that.

 9            Q     (BY MR. KELLIHER) Are there any managers

10    that were on duty in the cafe area that day?

11        A     I didn't see one.  They're usually roaming

12    around the store.

13            Q     Would there be any managers at the exit

14    area?  The exit area is right there by the cafe.

15        A     Right, it is.  I didn't see one.  There's

16    usually someone stationed there, checking receipts,

17    so that would be very close.  I don't know who was

18    on duty.

19            Q     Mr. Wilkins, do you understand that by

20    putting a table up on its side, you're creating a

21    risk that it could tip over?

22                  MR. SCOTT:  Object to the form.

23                  You can answer.

24                  THE WITNESS:  At the time I didn't think

25    they would tip over because I did it to other tables
```

1   and with no incident.

2         Q     (BY MR. KELLIHER) My question was, did you

3   realize you were creating a risk that it could

4   happen?

5         A     No.

6               MR. SCOTT:   Same objection.

7         Q     (BY MR. KELLIHER) Do you now know that

8   tipping a table up on its end creates a risk of it

9   tipping over?

10        A     Yes.

11        Q     And that's not something you do anymore?

12        A     No.   I don't understand why that table

13  tipped over.   The other tables were on their sides,

14  but when she walked behind me, the table fell on

15  her.   I don't know if she touched it, like I said, I

16  was facing the other direction.

17        Q     You've never seen the video?

18        A     No, I have not.

19        Q     No one's ever offered to show it to you?

20        A     No.

21        Q     No one at Sam's Club ever said, "Hey, we

22  need to sit down and review this video so that we

23  can get to the bottom of what happened"?

24              MR. SCOTT:   Object to the form.

25              You can answer.

Steve Wilkins                     6/9/2021                          **20**

```
1    lady walked, as I was turning, and the table tipped

2    over as I was turning, just as after I took off the

3    table seat and it fell on her.

4         Q    I asked you earlier if you had removed any

5    of the bench tops, you didn't think you had.  Having

6    seen the video now, does that change your

7    recollection?

8         A    Yes, it does.  I didn't remember doing

9    that.

10        Q    But in this video you've removed the

11   bolts, are taking off the bench top, and as you are

12   turning to set that bench top down on another table,

13   this table tips over and falls, true?

14        A    It did, the weight had changed.

15        Q    Mrs. Stanley-Coolahan didn't touch that

16   table, did she?

17        A    No, she -- no, she did not.

18        Q    Having seen that video, do you believe she

19   did anything wrong?

20        A    No, and it makes me feel even worse,

21   seeing that video.

22        Q    You feel bad about what happened, right?

23        A    Yes.

24        Q    You didn't mean for it to happen?

25        A    No, I didn't foresee it happening either.
```

Steve Wilkins                          6/9/2021                          **21**

1        Q      Had you foreseen it, you probably wouldn't

2   have done it this way, right?

3        A      No, I would not have.  I would have

4   crawled underneath the table to do the work, because

5   I had to -- I did that before and I cut out a piece

6   of cardboard to lay on and it was cumbersome and it

7   was a tight fit and it was hard to screw in the

8   bolts with my hands, that's the reason why I tipped

9   the tables over on their sides.

10       Q      And after this incident, when you had to

11  do a job like this, you'd remove the tables to the

12  receiving area, where there's no members present,

13  true?

14       A      No, I didn't do that anymore.

15       Q      Why?

16       A      It was -- I did not want that to happen

17  again.  The members' safety is number one in the

18  store.  When we have a storm drill, the first thing

19  we do, get the members out.  There's a fire, get the

20  members out.  The members are number one.

21       Q      You said something that's pretty

22  important, that member safety is number one, right?

23       A      Yes.  There's a sign in the break room, I

24  think it said, "Safety Comes First," if I remember

25  correctly.

1    manager at that time.

2         Q    Working on or fixing these tables was part

3    of your job, too, right?

4         A    Doing the cafe was my job.  I was trying

5    to go above and beyond.  I've seen other members of

6    maintenance do it, but he crawled underneath the

7    table to do it.  I would see, from time to time, a

8    bolt on the ground and wonder what happened.  People

9    are moving those tables around and they're loosening

10   them up, so I tried to tighten them up and make sure

11   they were secure.

12        Q    You'd done the same thing earlier that

13   day?

14        A    Yes.

15        Q    Had you done it other times prior to that

16   as well?

17        A    That was the first time that I tipped the

18   tables on their sides.

19        Q    Bad question.  Had you had to tighten up

20   bolts on the tables before?

21        A    Yes.

22        Q    How did you do it those other times?

23        A    With my hand.

24        Q    What would you do, kneel down and reach

25   under?

```
 1                  THE WITNESS:  Okay.

 2                  MR. KELLIHER:  Thank you, sir.  Pass the

 3     witness.

 4                     CROSS-EXAMINATION

 5     BY MR. SCOTT:

 6          Q     Mr. Wilkins, we met before we went on the

 7     record, but my name is Jeffrey Scott.  I represent

 8     Sam's.

 9          A     Okay.

10          Q     I do have just some quick follow-up

11     questions.

12                  We talked about the training you received

13     from Sam's Club.

14          A     Yes.

15          Q     Would you have ever done anything

16     intentionally to harm a customer?

17          A     Never.

18          Q     When you first started the process of

19     working on the table that you've now seen in the

20     video, did you ever see the plaintiff in the area,

21     Ms. Stanley?

22          A     See the what?

23          Q     Did you ever see the plaintiff,

24     Ms. Stanley-Coolahan, in the area?

25          A     No.
```

1        Q      Whenever you started that task of moving

2    those tables onto their side, were you concerned

3    that they were going to be flipping over?

4        A      No, because I did more than one, that was

5    probably the third -- second or third one that I did

6    without incident.

7        Q      If there had been some customers that you

8    had seen in the area when you were doing this task,

9    would you have done it that way?

10       A      No.

11       Q      And based on the video, you observed that

12   you were working on the table and Ms. Stanley

13   Coolahan walked between the two tables and that's

14   when the table fell over; correct?

15       A      Yes, as I was turning, the table fell was

16   she was walking right beside the table.

17           MR. SCOTT:   Okay.   I have nothing further.

18                   REDIRECT-EXAMINATION

19   BY MR. KELLIHER:

20       Q      There were a lot of customers in that

21   area?

22       A      Yes, and I saw in the video that there was

23   some other people that walked between the table, but

24   I had not taken that seat off yet.   I think the

25   problem is taking that seat off completely.   I can't